ELLEN C. GILLESPIE, as Executrix of the Last Will and Testament of JAMES GILLESPIE, Deceased, Plaintiff, *v.* WILLIAM A. GILLESPIE, Individually and as Executor of the Last Will and Testament of JAMES GILLESPIE, Deceased, Defendant.

Supreme Court, Niagara County, May 5, 1924.

**Partnership — accounting — action by estate of deceased partner to wind up affairs of copartnership — articles of copartnership, providing for payment of two-thirds of net profits to deceased partner and one-third to defendant, modified by written memorandum giving defendant one-half interest in profits — memorandum modified original copartnership articles only as to share in profits — defendant not entitled to one-half interest in net assets of firm.**

A written memorandum to a copartnership agreement, which provided for the payment of two-thirds of the net profits of the business to the partner subscribing to the bulk of the copartnership capital, with the remaining one-third going to the defendant, the other partner, who had not contributed anything by way of capital, to the effect that thereafter the parties to the agreement were to be " equal partners in the firm," did not in any way change or modify the rights and equities theretofore existing between the parties beyond modifying the original copartnership agreement as to the share in the profits to be received by each partner.

Accordingly, upon an accounting proceeding by the estate of the partner subscribing to the bulk of the capital, the respective contributions of each partner to the capital of the firm must be considered and repaid before there can be a division of the remainder of the assets. The defendant, under the memorandum, is not entitled to an equal share of the net assets of the firm.

ACTION by executrix of deceased partner to wind up affairs of copartnership.

56

*Dow Vrooman* [*Norman D. Fish* of counsel], for the plaintiff.

*Donald S. Moore* [*Eugene M. Ashley* of counsel], for the defendant.

CHARLES B. WHEELER, Official Referee:

The plaintiff's testator, James Gillespie, and his son, William A. Gillespie, on July 5, 1910, entered into articles of copartnership to conduct a general business in lumber under the firm name of " James Gillespie." The articles recited that James Gillespie and his son William A. Gillespie had prior to that date conducted a successful business in lumber under that name, and that James Gillespie had contributed the sum of $24,000 to its capital with the understanding that that sum should be paid back to him in case of dissolution of the copartnership, and that he was to have two-thirds of the net profits of. the business. The articles further recited the business had been successful and that there were net assets of said firm amounting to upwards of $40,000.

The articles then provided for a continuance of the business under the same name and style, so long as mutually agreeable; that James Gillespie should receive two-thirds, and his son William one-third of the net profits of said business, and losses should be borne by the parties in the same proportion; that on the dissolution of said firm the assets remaining after the payment of all debts and liabilities should be divided between them as follows, to wit: To James Gillespie $24,000 thereof and two-thirds of the remainder, and to the son William one-third of the remainder. The articles of copartnership contained other provisions relating to the conduct of the business not necessary to refer to here.

The business appears to have been continued under this partnership agreement until January 1, 1918, when it was modified by a verbal agreement between the members of the firm. On June 7, 1921, the father, James Gillespie, was in the hospital about to undergo an operation. Just before going onto the operating table William A. Gillespie drew and had his father sign the following memorandum or agreement:       " *June* 7, 1921.

" Revising our partnership agreement of July 5, 1910, and confirming our verbal agreement of January 1, 1918, it is agreed and understood mutually and severally that James Gillespie and William A. Gillespie are equal partners in the firm of ' James Gillespie,' Wholesale Lumber, North Tonawanda, N. Y.

" (Signed)       JAMES GILLESPIE<br>
" (Signed)       WM. A. GILLESPIE

" Witnesses

      " HENRIETTA G. MILLENER

      " GEORGE E. GILLESPIE."

Not long after the execution of this paper James Gillespie died, and since his death the business has been continued by the son William A. Gillespie as surviving partner.

James Gillespie left a last will and testament appointing his widow, Ellen C. Gillespie, and his son William, executors. This action is brought by the executrix to wind up the affairs of the copartnership. The firm evidently prospered and has accumulated assets from its operations.

Hearings have been had before the referee touching the state of the accounts of said business, but before any final decision is made determining the extent of the liability of the surviving partner it has been thought best by counsel that the referee should find and report the basis on which such accounting should proceed.

The plaintiff contends that upon a winding up of the affairs of the firm the contributions of the father to the capital after the payment of firm debts, should next be repaid to his estate, and a distribution should be made on that basis.

The defendant on the other hand claims that by virtue of the agreement signed June 7, 1921, he became not only entitled to one-half the profits of the business, but also the owner of one-half of all the net assets of the firm, and cannot be legally called on to repay contributions to capital.

The evidence does not disclose that the defendant contributed anything by way of capital to the firm beyond his share of the accumulations by way of profits, which went into the business and became a part of its assets. The recital in the copartnership agreement of 1910 that the father had contributed $24,000 toward the capital and the absence of any mention of a contribution by the son clearly indicates that the son had made no contribution to the original capital of the business. The main question, therefore, is as to the force and legal effect of the agreement above set forth as touching their respective rights as the members of the firm in the copartnership assets. It involves a construction of the paper signed on June 7, 1921. The memorandum of June 7, 1921, must be deemed a modification of the copartnership articles of 1910 with all the provisions of the agreement of 1910 still in force except as so modified.

Certain propositions of law are too well established to require citation of authorities, viz.:

In the absence of agreement each partner is deemed in equity a creditor of the firm and is entitled on a liquidation of its affairs to be reimbursed for all moneys advanced. (30 Cyc. 441.)

This includes contributions to capital of the firm (30 Cyc. 443), although such contributions do not carry interest in the absence

of an agreement to that effect. (*Rodgers* v. *Clement,* 162 N. Y. 422.)

Indeed section 40 of the Partnership Law (Laws of 1919, chap. 408) prescribing " Rules determining rights and duties of partners," declares: " Each partner shall be repaid his contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute toward the losses, whether of capital or otherwise, sustained by the partnership according to his share in the profits."

This declaration of the statute created no new law on the subject, but amounted only to a codification of well-recognized rules long existing. (*Seligman* v. *Friedlander,* 199 N. Y. 373.)

As between partners, those contributing to the capital become creditors of the firm to the amount advanced. (30 Cyc. 691, 740, 741; *Whitcomb* v. *Converse,* 119 Mass. 38; *Neudecker* v. *Kohlberg,* 3 Daly, 407; 1 Lindley Part. [Rapalje Am. ed.] 142.)

When, therefore, the agreement of June 7, 1921, states: " It is agreed and understood mutually and severally that James Gillespie and William A. Gillespie are equal partners in the firm of ' James Gillespie,' " did that in any way change or modify the rights and equities theretofore existing beyond giving the son a half interest in the profits, instead of a third interest as it existed under the former agreement of July 5, 1910?

The referee is of the opinion that it did not, and that the memorandum must be construed as only modifying the former copartnership articles as to the share in the profits to be received by each.

The evidence tends to show that the net worth of the firm on December 31, 1917, was approximately $69,000. If we deduct from that sum James Gillespie's contribution of $24,000 to the capital as of July 5, 1910, we have left $45,000, two-thirds of which, $30,000, belonged under the agreement of that date to James Gillespie, the father. In other words, on December 31, 1917, James Gillespie's interest in the net assets of the firm was $54,000, and William A. Gillespie's interest was $15,000. If the individual drawings of the members of the firm were taken into consideration, then the interest of William A. Gillespie on a distribution as of December 31, 1917, would have been still less. If the defendant's contention be correct then the memorandum of June 7, 1921, confirming the verbal agreement of January first operated to give him a half interest in all the net assets of the firm and amounted to a gift enlarging his interest from $15,000 as of December 31, 1917, to $34,500 on January first, or a gift from the father to the son of

$19,500. We cannot believe that such was the purpose or intent of the instrument, or of the parties to it.

To justify the result claimed by the defendant we are of the opinion that something more specific, definite and certain must be contained in the instrument itself. The paper in question is silent as to the contributions of each. It does not undertake to state their actual or equitable interest in the assets of the firm. It contains no words of gift or transfer of any equitable interest from the father to the son, and in the absence of some clause or words expressing such an intention we do not think the paper should be construed to change or modify the well-recognized rights of partners as between themselves or defeat the provisions of the existing statute touching such rights when a final liquidation and distribution is had. There was no waiver of the father's rights in this regard.

Two lawyers agree to become equal partners in the practice of their profession. One of them has a valuable library which he places at the service of the firm. It would not be pretended that when the partnership ended each owned half the library. Chancellor KENT defines a partnership as " a contract of two or more competent persons to place their effects, labor and skill, or some or all of them in lawful commerce or business, and to divide the profits and bear the loss in certain proportions."

In *O'Donohue* v. *Bruce* (92 Fed. 858) it is said: " The accepted definition of a partnership is ' the voluntary association of two or more persons in sharing the profits and bearing the losses of a general trade, or a specific adventure.' "

When one is said to be an equal partner in a business it means that each shares equally in the profits and losses, and does not imply that each has contributed an equal amount towards the working capital, or that on a dissolution the contributions of each are not to be returned in accordance with the equitable rules which obtain. Consequently in construing the agreement now under consideration the referee is of the opinion that the agreement should not be held to do more than give the defendant an equal share in the profits of the lumber business caried on by him and his father under the style and firm name of " *James Gillespie*," preserving to the father all the existing equitable rights he had upon a winding up of the firm affairs.

Lindley in his work on Partnership (Vol. 2 [Rapalje Am. ed.], p. 595) says, in defining the meaning of the word " equality:" " When it is said that the shares of partners are *prima facie* equal, although their capitals are unequal, what is meant is that losses of capital, like other losses, must be shared equally; but it is not meant that

on a final settlement of accounts, capitals contributed unequally are to be treated as one aggregate fund which ought to be divided between the partners in equal shares." (See, also, *Hillock* v. *Grape*, 111 App. Div. 720, 724, 725.)

In construing contracts the words used to express the agreement of parties are to be given their usual and ordinary meaning, but in so doing courts will endeavor to give a construction most equitable to the parties, and not give one of them an unfair advantage over the other. (9 Cyc. 587, and cases cited, among them being *Smith* v. *Robson*, 148 N. Y. 252; *Russell* v. *Allerton*, 108 id. 288, and *Lorillard* v. *Clyde*, 86 id. 384. See, also, *Buffalo & L. Land Co.* v. *Bellevue L. & I. Co.*, 165 N. Y. 247, 254, and *Schoellkopf* v. *Coatsworth*, 166 id. 77, 84.)

It should be noted in addition that the evidence is that the memorandum of June 7, 1921, was prepared and written by the defendant William A. Gillespie and if this paper may be said to be of doubtful meaning it is the well-settled rule that the words used will be interpreted most strongly against the party writing them. (9 Cyc. 590; *Duryea* v. *Mayor*, 62 N. Y. 592; *Hoffman* v. *Ætna Fire Ins. Co.*, 32 id. 405.)

We, therefore, reach the conclusion that the agreement of June 7, 1921, confirming the verbal understanding of January 1, 1918, did not operate to give the defendant an equal share in the net assets of the business, but only an equal share in the profits thereof, and that on the accounting the respective contributions of each to the capital of the firm must be taken into consideration, and repaid the contributor before there is a division of the remainder of the assets.